**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-22700-BLOOM/Otazo-Reyes**

EDDY MARTINEZ,

      Plaintiff,

v.

MIAMI CHILDREN'S HEALTH SYSTEM,
INC. and NICKLAUS CHILDREN'S
HEALTH SYSTEM EXECUTIVE SEVERANCE
POLICY,

      Defendants.

_____/

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

    **THIS CAUSE** is before the Court upon the Plaintiff Eddy Martinez's ("Martinez") Motion for Summary Judgment, ECF No. [230], and Defendants Miami Children's Health System, Inc.'s ("NCHS") and Nicklaus Children's Health System Executive Severance Policy's ("Severance Policy"), Motion for Summary Judgment, ECF No. [227]. Martinez additionally filed a "Motion for Application of *De Novo* Standard of Review," ECF No. [232], which was improper for reasons addressed in the Discussion, *infra*. The Motions are fully briefed.[1] For the reasons set forth below, Defendants' Motion is denied, and Martinez's Motion is granted in part and denied in part.

---

[1] Martinez filed a Response to Defendants' Motion, ECF No. [241], to which Defendants filed a Reply, ECF No. [247]. Defendants additionally filed a Notice of Supplemental Authority. ECF No. [250].

Defendants filed a Response to Martinez's Motion, ECF No. [238], to which Martinez filed a Reply, ECF No. [248].

## I.      BACKGROUND

This case concerns Martinez's termination from employment at NCHS and the Severance Policy's decision to deny him severance pay. *See* ECF No. [1-2]. Martinez's original Complaint asserted three causes of action: (1) Breach of Contract due to Defendants' alleged failure to grant severance benefits, (2) Unlawful denial of benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and (3) Defamation. *Id.* Counts I and III have been dismissed. *See* ECF Nos. [41], [203]. Thus, only the ERISA claim remains.

In their Motion, Defendants argue that the Severance Policy's denial of Martinez's request for severance pay should be affirmed because the Severance Policy's decision was not arbitrary and capricious. ECF No. [227]. They assert that Martinez received a full and fair review of his severance claim, and the Severance Policy's Administrator correctly determined that Martinez committed material violations of his contract with NCHS, justifying his termination for "Cause" and precluding him from receiving severance benefits. *Id.*

In his Motion, Martinez argues that the Severance Policy's adjudication of his severance claim was procedurally inadequate and infected with bias. ECF No. [230]. He further argues that the Severance Policy's decision was arbitrary and capricious. *Id.*

Along with his Motion for Summary Judgment, Martinez additionally filed a "motion" entitled Motion for Application of *De Novo* Review. ECF No. [232] ("*De Novo* Motion"). Therein, Martinez argues that "based on the record of bad faith, negligence and lack of due diligence shown by NCHS and its counsel, Hogan Lovells . . . *de novo* review should be applied to the facts of this case," rather than the deferential arbitrary-and-capricious standard. *Id.* at 11.[2] In response, Defendants assert that Martinez's Motion is procedurally improper and otherwise meritless. ECF

---

[2] Unless otherwise noted, the Court cites to the page numbers generated by the CM/ECF filing system, which appear in blue at the top right of all filings.

No. [237] at 1.

## II.    MATERIAL FACTS

Based on the parties' respective statements of material facts,[3] along with the evidence in the record, the following facts are not genuinely in dispute, unless otherwise noted.

Martinez was an at-will employee of Defendant NCHS from April 2009 through July 2, 2019. Def. SMF ¶¶ 1-4; Pl. RSMF ¶¶ 1-4. At the time of his termination in 2019, he held the position of Senior Vice President and Chief Information Officer ("CIO"). Pl. SMF ¶¶ 3-5; Def. RSMF ¶ 3-5.[4]

On February 8, 2014, the Nicklaus Children's Health System Executive Severance Policy ("Severance Policy") went into effect. Def. SMF ¶ 5; Pl. RSMF ¶ 5. The Severance Policy names NCHS as the Administrator and affords it "the sole and absolute discretion" in determining eligibility for severance benefits. Def. SMF ¶¶ 7, 9; Pl. RSMF ¶¶ 7, 9. The Severance Policy is governed by ERISA. ECF No. [1-4] at 13. The Severance Policy further provides that "Severance Pay will not be granted to a Participant who is discharged from employment by [NCHS] for cause ('**Discharge for Cause**'), as determined in [NCHS]'s sole discretion." *Id.* at 5-6. The Severance Policy lists eight reasons that constitute Discharge for Cause. *Id.* at 6.

At some point in the first half of 2019, the CEO of NCHS, Dr. Narendra Kini, resigned. Pl. SMF. ¶ 8; Def. RSMF ¶ 8. On June 28, 2019, the NCHS Board of Directors offered Martinez a

---

[3] Defendants supported their Motion with a Statement of Material Facts, ECF No. [228] ("Def. SMF"). Martinez filed a Response Statement of Material Facts, ECF No. [242] ("Pl. RSMF").

Martinez supported his Motion with a Statement of Material Facts, ECF No. [231] ("Pl. SMF"). Defendants filed a Response Statement of Material Facts, ECF No. [239] ("Def. RSMF").

[4] Defendants correctly point out that Plaintiff's Statement of Material facts frequently cites to allegations within his Complaint, ECF No. [1-2], rather than record evidence. The Court recites such allegations as facts only when Defendants' RSMF reveals that they are undisputed.

Retention Bonus Agreement that provided he would receive a $100,000.00 bonus if he agreed to continue to serve as an executive with NCHS for twelve months following Dr. Kini's resignation. Pl. SMF ¶¶ 14-15; Def. RSMF ¶ 14-15.

Three days later, on July 1, 2019, Matt Love was appointed interim CEO. Pl. SMF ¶ 9; Def. RSMF ¶ 9. The following day, on July 2, 2019, Matt Love terminated Martinez's employment. Pl. SMF ¶ 11; Def. RSMF ¶ 11. At a meeting on July 2, 2019, Matt Love informed Martinez that his termination was for "cause." According to Martinez, the only reason Matt Love provided to Martinez for his termination was that Martinez improperly split an invoice to circumvent a NCHS policy. ECF No. [228-13] at 4. Matt Love asserts that he also told Martinez that he was terminated for "breaking policies and procedures." Love Dep. at 52:18-23, ECF No. [228-12].

On August 28, 2019, Martinez applied for severance benefits under the Severance Policy. Pl. SMF ¶ 18; Def. RSMF ¶ 18. NCHS, the Administrator of the Severance Policy, referred Martinez's severance claim to NCHS's legal department. Pl. SMF ¶ 28; Def. RSMF ¶ 28. From that point forward, NCHS's General Counsel, Jodi Laurence ("Laurence"), represented NCHS as Administrator and spoke on its behalf with respect to severance claims. Def. SMF ¶ 8; Pl. RSMF ¶ 8.[5]

Laurence, on behalf of the Administrator, decided to retain Hogan Lovells US LLP ("Hogan Lovells") to review Plaintiff's severance claim "and perform whatever services were necessary to analyze and respond to the claim in anticipation of litigation by Mr. Martinez." Def. SMF ¶ 12; Pl. RSMF ¶ 12. Hogan Lovells conducted an internal investigation and then prepared a

---

[5] Martinez asserts that the original entity representing NCHS as Administrator was NCHS's Chief Talent Officer. Pl. RSMF ¶ 8. Martinez does not contest that Laurence was subsequently designated as the Administrator's contact person. *Id.*

draft letter, on behalf of the Administrator, denying Martinez's severance claim Def. SMF ¶ 14; Pl. RSMF ¶ 14, 16. Laurence approved the draft letter and authorized Hogan Lovells to send a finalized letter response ("Initial Denial") to Martinez's counsel. Def. SMF ¶¶ 16-17; Pl. CSMF ¶¶ 16-17.

The Initial Denial asserts four grounds for denial of severance: (a) Material violations of the NCHS Code of Conduct; (b) Material violations of NCHS policies; (c) Material falsification and/or unauthorized alteration of NCHS records; and (d) Commission of acts of moral turpitude. *See* ECF No. [92-5] at 4-8.

Martinez, through counsel, appealed the Initial Denial in accordance with the Severance Policy's procedures. Def. SMF ¶ 19; Pl. RSMF ¶ 19. Martinez's Appeal was 38 pages long, ECF No. [228-13], and included 381 pages of exhibits. ECF No. [228-14] ("Appeal"). Therein, Martinez contested each of the Initial Denial's grounds of termination for "cause," accused Hogan Lovells of being impaired by a conflict of interest, and noted that "key witnesses" had not been interviewed, including Martinez. ECF No. [228-13] at 3.

Hogan Lovells reviewed Plaintiff's Appeal, conducted additional inquiry, and prepared a draft response on behalf of NCHS as Administrator. Def. SMF ¶ 20; Pl. RSMF ¶ 20. Laurence approved Hogan Lovells' draft and authorized Hogan Lovells to send it to Martinez's counsel. Def. SMF ¶ 21; Pl. RSMF ¶ 21. On August 24, 2020, Hogan Lovells, on behalf of the Administrator, sent its Final and Binding Benefits Determination ("Final Denial"), which explained that Martinez's claim for severance benefits was denied. ECF No. [92-6].

On March 8, 2021, Martinez initiated this case in the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. ECF No. [1]. On July 26, 2021, Defendants removed the case to federal court. *Id.*

### III.    LEGAL STANDARD

In general, a court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

However, "ERISA cases are unlike a typical summary judgment analysis where questions of material fact require a trial." *Foster v. Hartford Life & Accident Ins. Co*., No. 09-cv-80933, 2010 WL 11504337, at *9 (S.D. Fla. Sept. 7, 2010). That is because, when an ERISA plan affords the administrator "discretion in reviewing claims," the Court owes deference to the administrator's decision. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). The Eleventh Circuit has established a six-part process when reviewing a plan administrator's benefits decision:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355 (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010)). Normally, when reviewing the merits of the administrator's decision, a court is limited to "consideration of material available to the administrator at the time it made its decision[.]" *Id*. at 1354.

Sometimes, however, prior to conducting the six-part merits review of the administrator's decision, a court must first evaluate the administrator's adjudication procedure. ERISA "sets forth a special standard of care upon a plan administrator, namely, that the administrator 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan[.]" *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (quoting 29 U.S.C. § 1104(a)(1)). "[I]t simultaneously underscores the particular importance of accurate claims processing by insisting that administrators 'provide a "full and fair review" of claim denials[.]'" *Id*. (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). The administrator must discharge its duties with "the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use[.]" 29 U.S.C. § 1104(a)(1)(B). Accordingly, ERISA imposes upon the plan administrator "the responsibility to fully investigate a claim before denying benefits." *Boysen v. Illinois Tool Works Inc. Separation Pay Plan*, 767 Fed. Appx. 799, 807 (11th Cir. 2019) (cleaned up; quoting *Capone*, 592 F.3d at 1199-20). When examining whether an administrator conducted a "full and fair review," courts "are not deciding whether the plan administrator's decision enjoys factual support in the record; rather, [courts] are reviewing whether the plan administrator satisfied his obligations in compiling that record." *Id*. at 806. The Eleventh Circuit has clarified that this "full and fair review inquiry is

antecedent" to the six-part analysis of the merits of an administrator's decision. *Id.* at 807; *see also Melech v. Life Ins. Co. of N.A.*, 739 F.3d 663, 673 (11th Cir. 2014) ("This inquiry . . . is a predicate to our ability to review the substantive decision we have been asked to review." (citation omitted)). If a court concludes that the plan administrator failed to conduct a full and fair review, "the proper course of action is to remand . . . rather than to evaluate the merits of [a] claim for benefits using evidence that [the administrator] did not consider." *Id*. at 676 (citation omitted).

Unlike when evaluating the merits of an administrator's decision, when conducting the "full and fair" inquiry, a court affords no deference to the administrator. *Boysen*, 767 F. App'x at 806. "Because this determination is a matter of reviewing whether the claims administrator complied with statutory procedural requirements, it receives *de novo* review." *Browning v. Hartford Life & Accident Ins. Co.*, No. 18-cv-80991, 2019 WL 7841719 at *6 (S.D. Fla. Apr. 23, 2019) (citing *Boysen*, 767 F. App'x at 806). Moreover, when evaluating "claims alleging procedural irregularities and conflicts of interest affecting a claimant's full and fair review," the Court may consider evidence outside of the administrative record. *Bloom v. Hartford Life & Accident Ins. Co.*, 917 F. Supp. 2d 1269, 1277 (S. D. Fla. 2013) (citations omitted).

## IV. DISCUSSION

In this ERISA case, the primary issue is whether the Administrator afforded Martinez a "full and fair" review of his severance claim. Prior to reaching that issue, however, the Court must address a procedural matter that arose during briefing.

### A. Plaintiff's Motion for Application of *De Novo* Standard of Review

The Local Rules of this District Court impose a 20-page limitation on motions. S.D. Fla. L.R. 7.1(c)(2). On March 30, 2023, Martinez filed a Motion to Exceed Page Limits, in which he requested eight additional pages to brief his Motion for Summary Judgment. ECF No. [224].

Defendants agreed to three extra pages. *Id.* at 1. The Court, in consideration of the overall complexity of this case – which is low – limited Martinez to five additional pages. ECF No. [225]. Martinez's Motion for Summary Judgment is exactly 25 pages, without a line to spare. *See* ECF No. [230].

Along with his Motion for Summary Judgment, Martinez filed an additional "motion" entitled "Motion for Application of *De Novo* Review." ECF No. [232]. That "motion" does precisely what its title implies: It argues that the Court should apply *de novo* rather than arbitrary and capricious review to the Administrator's decision to deny Martinez severance pay. *Id.* It does not seek relief separate from the relief sought in Martinez's Motion for Summary Judgment. In essence, it is not a motion at all, but rather an additional eleven pages of argument in support of Martinez's Motion for Summary Judgment.

The Court agrees with Defendants that Martinez's Motion "is nothing more than a transparent attempt to subvert . . . the Court's Order limiting [him] to 25 pages for his Motion for Summary Judgment[.]" ECF No. [237] at 1; *see also* Martinez's Reply, ECF No. [249] at 2 (failing to meaningfully contest Defendants' assertion that the Motion violates the Court's Order). Accordingly, the Court will not consider Martinez's improper Motion for Application of *De Novo* Review.

### B. Full and Fair Review

Prior to reaching the merits of the Administrator's decision to deny Martinez severance pay, the Court must evaluate Martinez's claim that the Administrator failed to provide him with a "full and fair review" of his claim. ECF No. [230] at 3; 29 U.S.C. § 1133(2). Martinez asserts that "NCHS, working through its in-house counsel and outside counsel, Hogan Lovells, had a prearranged 'plan' to deny Mr. Martinez's severance claim, and that they worked towards that plan

from the beginning of the claim until the issuance of [the] issuance of the Final Adverse Determination Letter in violation of NCHS' fiduciary duty to Mr. Martinez[.]" ECF No. [230] at 3-4. For the reasons explained below, the Court largely agrees. The uncontroverted evidence reveals that the adjudication process in this case was replete with "procedural unfairness." *Melech*, 739 F.3d at 676.  Accordingly, as *Melech* instructs, the Court's "proper course of action" is not to "evaluate the merits" of the Administrator's decision, as Defendants request, but rather to remand to the Administrator for reevaluation. *Melech*, 739 F.3d at 676; *see id.* at 673 ("As a matter of common sense, we cannot evaluate [an administrator]'s ultimate decision to deny [a] claim without first considering whether the record [the administrator] had before it was complete.").

The Court's discussion will proceed as follows. (i) First, the Court addresses the uncontroverted evidence that demonstrates the Administrator's bias against Martinez's claim. (ii) Second, the Court explains why that bias was not neutralized by the Administrator's hiring of Hogan Lovells. (iii) Third, the Court discusses concrete examples that evince how the "procedural unreasonableness" employed by the Administrator led to an unreliable decision. *Melech*, 739 F.3d at 675. (iv) Fourth and last, the Court concludes that remand is necessary because Martinez was deprived his statutory right to a "full and fair review" of his claim for ERISA benefits. 29 U.S.C. § 1133(2).

### i.  The Administrator Predetermined the Outcome of Martinez's Claim

The uncontroverted facts reveal that the Administrator in this case – NCHS – was impaired by an actual conflict of interest. The Eleventh Circuit has recognized that "[a] pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Blankenship*, 644 F.3d at 1355. That is certainly the case here: NCHS is both the Administrator and the payer of benefits. ECF No. [1-4] at 15 ("All

payments under this Policy are made from [NCHS]'s general assets.").

Defendants are correct that, in a typical ERISA case, a structural conflict of interest "is 'merely a factor' for the court to consider in determining whether the benefits decision at issue was arbitrary and capricious." ECF No. [247] at 6 (quoting *Blankenship*, 644 F.3d at 1355). As the Court will explain, however, this is not a case of a mere structural conflict of interest. Rather, the uncontroverted evidence reveals that the Administrator – NCHS – predetermined the outcome of Martinez's claim for severance pay.

NCHS decided to deny Martinez severance pay around July 2, 2019, the day he was fired. This finding is supported by a "talking points" email from NCHS's Deputy General Counsel, Kara Nickel ("Nickel") to Matt Love, sent the day before Martinez's termination, explaining the reasons Martinez was being terminated for cause and being denied severance pay. ECF No. [230-12] at 3-4. Martinez has consistently asserted that, at or shortly after the termination meeting, NCHS informed him he was not eligible for severance pay. *See, e.g.*, ECF No. [230-23] at 2. A hospital board member, who was present at that meeting, testified that either before or shortly after that meeting, he and Matt Love discussed that Martinez "was being terminated for cause" and would receive "no severance package." Murgado Dep. at 22, ECF No. [228-20]. In an email from Nickel to Hogan Lovells, dated November 22, 2019, Nickel stated that Martinez had already been "determined to be not eligible for severance under the policy." ECF No. [230-16] at 2. A subsequent email from Nickel to Hogan Lovells repeated that NCHS had already "denied paying severance[.]" ECF No. [230-19] at 2.

Defendants do not dispute that Matt Love informed Martinez at the termination meeting that Martinez was being fired for "cause." Pl. SMF ¶ 11; Def. RSMF ¶ 11. However, Defendants attempt to create a question of fact as to whether NCHS additionally predetermined that Martinez

was not entitled to severance. *See, e.g.*, Def. RSMS ¶ 17 (disputing whether an individual email states that NCHS told Martinez he was not entitled to severance); *id.* ¶ 21 (same). However, Defendants have produced no evidence that calls into question the evidence described in the previous paragraph. The only relevant evidence they have produced is the deposition testimony of Matt Love, the interim CEO, who informed Martinez of his termination for "cause." Love Dep. at 47:1-13, ECF No. [228-12]. Matt Love does not *deny* having informed Martinez that he was ineligible for severance benefits, but merely testified that he does not remember whether they discussed this issue or not. *Id.* at 75-76. Matt Love's lack of memory does not call into question the abundant evidence that demonstrates NCHS predetermined that Martinez was not entitled to benefits, long before NCHS, as the Administrator, formally adjudicated Martinez's ERISA claim.

Relatedly, Defendants argue that the cause of Martinez's termination and his entitlement to severance are separate issues. They go so far as to state: "It is undisputed that NCHS terminated Plaintiff for cause, thus meeting a predicate for denial of severance." ECF No. [227] at 7 n.6. If the issue of "for cause" termination was truly undisputed, this lawsuit would not exist. Martinez's entitlement to severance depends entirely on whether his termination was for cause, as defined in the Severance Plan. ECF No. [1-4] at 5-6. As the pre-termination talking points memo from NCHS Deputy General Counsel reveal, NCHS was well aware that the issues of "for cause" termination and entitlement to severance benefits are inextricably linked. ECF No. [230-12] at 3-4.

In sum, the uncontroverted evidence reveals that, before formally adjudicating Martinez's severance claim as Administrator of the Severance Policy, NCHS determined that Martinez was not entitled to severance pay. That fact does not necessarily lead to the conclusion that the ERISA process was unfair. As the Supreme Court has recognized, the presence of a conflict of interest is normally a mere factor for a court to consider when reviewing an administrator's decision. *Glenn*,

554 U.S. at 117; *see also Blankenship*, 644 F.3d at 1355. NCHS could have "taken active steps to reduce potential bias and to promote accuracy," including, for example, by "walling off" a claims administrator or hiring an impartial outside adjudicator. *Glenn*, 554 U.S. at 117. However, that is not what occurred in this case.

### ii. The Administrator Hired Hogan Lovells to Defend Its Decision in Anticipation of Litigation

Defendants argue that NCHS's potential bias in the adjudication process was neutralized by NCHS's hiring of Hogan Lovells to conduct the severance inquiry. ECF No. [247] at 7. They contend that Hogan Lovells could not have been biased because it had no direct financial interest in the outcome of Martinez's severance claim. *Id.* However, the uncontroverted evidence reveals otherwise.

From the start, both the Administrator and Hogan Lovells understood that Hogan Lovells was being hired to defend the Administrator's decision to deny Martinez's severance claim. As Defendants admit, "Hogan Lovells was not delegated any duty or responsibility of the Administrator of the Severance Plan." Steinberg Decl. ¶ 14, ECF No. [76-2]. The Administrator's representative, Laurence, candidly explained what Hogan Lovells was hired to do: "Martinez had already been terminated for cause, there appeared to be a hostile and antagonistic relationship between Mr. Martinez and NCHS, and [Laurence] anticipated litigation by Mr. Martinez against NCHS." Laurence Dec. ¶ 16, ECF No. [230-18] at 30. Therefore, "in anticipation of litigation, [Laurence], on behalf of the Administrator of the Policy, retained litigators at Hogan Lovells with substantial litigation and trial experience to advise and defend [her]self, the Policy, and NCHS as Administrator." *Id.*

The Partner at Hogan Lovells in charge of this case, Marty Steinberg, confirmed his understanding that Hogan Lovells was hired to "prepare a response" to Martinez's request for

severance benefits "in anticipation of litigation." Steinberg Dec. ¶ 13, ECF No. [76-2]. Hogan

Lovells performed "an internal investigation" and "respond[ed] to an adverse party's lawyer's

presentation." *Id.* ¶ 14. Those statements from the Administrator and Steinberg indicate that Hogan

Lovells was not hired to conduct an independent investigation of Martinez's eligibility for

severance. An impartial adjudicator would not consider a claimant to be "adverse." *Id.* Rather,

Hogan Lovells was hired to defend NCHS's decision "in anticipation of litigation." Laurence Dec.

¶ 16, ECF No. [230-18] at 30; Steinberg Dec. ¶ 13, ECF No. [76-2].

Additional communications between Hogan Lovells and NCHS demonstrate that Hogan

Lovells was by no means acting independently of NCHS's influence. In an email chain between

Nickel and Steinberg, Nickel expressed displeasure when Martinez's counsel disputed the

Administrator's entitlement to an additional 90 days to respond to Martinez's claim. ECF No.

[230-4] at 2 ("Really? Sigh . . . . ."). Steinberg responded: "We need to keep to our plan[.]" *Id.*

Nickel answers: "I know and agree –." *Id.* Whether the "plan" is an agreement to deny Martinez's

severance claim – as Martinez argues – or simply a decision to invoke the 90-day extension – as

Defendants argue – the emails demonstrate that Nickel was actively engaged in the adjudication

process. As noted above, Nickel was NCHS's Deputy General Counsel who sent the "talking

points" pre-termination email to Matt Love explaining the reasons to terminate Martinez for cause

and deny him severance pay. ECF No. [230-12] at 3-4.

Hogan Lovells later wrote to Nickel that Hogan Lovells would draft the Initial Denial "as

a 'kitchen sink' letter" that includes not only NCHS's original reasons for firing Martinez, but also

additional ones that Hogan Lovells uncovered in its investigation. ECF No. [230-7] at 4. Nickel

reviewed the Initial Denial, stated that it "reads well," and offered "only a few suggestions." ECF

No. [230-7] at 2.

Following Martinez's appeal of the Administrator's Initial Denial, Hogan Lovells explained to Nickel Hogan Lovells' strategy to "rebut [Martinez]'s arguments in opposition." ECF No. [230-1] at 2. In another email, a Hogan Lovells associate writes, "I believe that we can still make the arguments that you'll see in the final determination letter[.]" ECF No. [230-3] at 2. Nickel made "a small number of edits" to the Final Denial drafted by Hogan Lovells. ECF No. [230-2] at 2. She concluded: "I hope that this letter deters Ed (or at least his counsel Eddy Marban) [from filing an ERISA lawsuit], but I anticipate it will not." *Id.*

Martinez asserts that the CEO who fired him, Matt Love, was actively involved throughout the ERISA review process. ECF No. [230] at 11. Martinez has presented contemporaneous emails that strongly support his contention. *See* ECF No. [230-16] at 2 (Nickel stating that the Administrator was "going to recommend to Matt" to hire Hogan Lovells to "take over handling the dispute with Ed Martinez"); ECF No. [230-19] at 2 (Nickel to Hogan Lovells: "As we discussed, I will be getting clarity from Matt as to strategy, and we can all talk together if needed."); ECF No. [230-12] at 2 ("I will circulate the revised letter to Matt as well – he needs to be in agreement."); ECF No. [230-7] at 2 ("Matt reviewed the first version last week, and had no comments/revisions."). However, Laurence, Steinberg, and Matt Love all aver that Matt Love was not involved in the severance claim process. Laurence Dec. ¶ 18, ECF No. [176-1]; Steinberg Dec. ¶ 16, ECF No. [76-2]; Love Dep. at 118-19, ECF No. [230-17]. Because there is conflicting evidence on this issue, the Court therefore considers Matt Love's involvement in the claims process to be a disputed factual issue, and, for the purposes of this Order, accepts Defendants' position that he was not involved.

By her own admissions, the Administrator's representative, Laurence, relied on Hogan Lovells' investigation and analysis. She provided no input regarding preparation of the Adverse

Determination Letters. Laurence Dep. at 11:10-15,[6] ECF No. [230-18] at 4. She was not involved with Hogan Lovells' investigation, *id*. at 44:18-19, and she conducted no independent, additional investigation, *id.* at 55:21-22. Other than the letters from Hogan Lovells and accompanying exhibits, Laurence did not "consider any other documents or information in reaching the decision to deny Mr. Martinez's claim for severance or the subsequent appeal of that denial." Laurence Dec., ECF No. [176-1] ¶ 17. In reaching her decision, she "relied on" the letters and exhibits produced by Hogan Lovells. Laurence Dep. at 13:18-23, ECF No. [230-18] at 5.

The unassailable conclusion from those facts is that Hogan Lovells did not act "as independent counsel" to conduct an impartial review of Martinez's claim. *Lee v. Equity Props. Asset Mgmt., Inc.*, No. 13-cv-2239, 2015 WL 6956556, at *13 (M.D. Fla. Nov. 10, 2015). Rather, the role of Hogan Lovells was to defend NCHS's decision to deny Martinez severance pay "in anticipation of litigation." Laurence Dec. ¶ 16, ECF No. [230-18] at 30. Hogan Lovells considered Martinez to be an "adverse party," Steinberg Dec. ¶ 14, ECF No. [76-2], and did its best to "rebut [Martinez]'s arguments[.]." ECF No. [230-1] at 2. Those statements are not indicative of the "nonadversarial method of claims settlement" that ERISA is designed to foster. *Watts v. Bellsouth Telecomms., Inc.*, 316 F.3d 1203, 1209 (11th Cir. 2003) (quotation marks omitted).

In these circumstances, the Administrator's reliance on Hogan Lovells' work product "was unreasonable[.]" *Lee*, 2015 WL 6956556 at *13 (criticizing a process in which the administrator did not "independently evaluate[ ]" whether a claimant was entitled to benefits, but rather "relied entirely" on the opinion of a hired attorney). To discharge its duty to provide a "full and fair" review of Martinez's claim, the Administrator could not "[s]imply accept[ ] the bald assertions of [Hogan Lovells] without examining or evaluating their underlying bases[.]" *Shannon*, 113 F.3d at

---

[6] The filing containing Laurence's Deposition contains four transcript pages on each CM/ECF page, so the Court cites first to the deposition transcript page and then to the CM/ECF page number.

210. Yet, according to the Administrator's representative, Laurence, that is precisely what the Administrator did. Laurence Dec., ECF No. [176-1] ¶ 17.

As the Court explains in the next section, the procedurally deficient claim review in this case led to a deficient investigation, an incomplete administrative record, and a one-sided analysis.

### iii.  The Claim Investigation and Review was Deficient

The bias and unfairness of the claim process is manifested in the Initial Denial and Final Denial letters (collectively, the "Adverse Determination Letters"). While the Severance Plan grants the Administrator discretion to resolve factual issues, ECF No. [1-4] at 5-6, it is revealing that *every* factual issue is resolved against Martinez. *See* Final Denial, ECF No. [92-6] at 2-21. The Court will address three specific examples that evince the unfairness of the process employed in this case.

### (1) The Split Invoice

The first example relates to the NCHS's allegation that Martinez split a large invoice into two smaller invoices to avoid the need for review or approval. This alleged instance of invoice-splitting was one of at most two of the original reasons provided for Martinez's for-cause termination.[7]

According to the Initial Denial, at some point in 2018, Martinez was presented with an invoice of slightly less than $500,000 from NESA Solutions ("NESA"), a service provider at NCHS. ECF No. [92-5] at 6. Martinez allegedly instructed NESA to separate that invoice into two separate invoices, so that the payment to NESA would fall within the $250,000 threshold of Martinez's signing authority. *Id.* Thus, according to NCHS, Martinez maliciously intended to

---

[7] Martinez asserts that the split invoice was the *only* reason provided to him for his termination. ECF No. [228-13] at 4. Matt Love asserts that he also told Martinez that he was terminated for "breaking policies and procedures."  Love Dep. at 52:18-23, ECF No. [228-12].

circumvent NCHS's Contract Review Policy. *Id.*

In his Appeal, Martinez denied splitting the invoice for an improper purpose. ECF No. [228-13] at 8. He claimed that he had objected to paying the full amount of the original invoice because NESA's work had not been substantially completed. *Id.* He therefore consulted with Tim Birkenstock, a Chief Financial Officer at NCHS, and the two "agreed that NESA had to comply with the contract terms, which required invoices based on stages and milestones." *Id.* at 9. In response, NESA sent an invoice for $248,750 on August 15, 2018, and a second invoice for $249,500 one month later. *Id.* In October, Martinez informed Birkenstock that there had been substantial completion on the project in question. ECF No. [228-14] at 326 (Martinez's Declaration in support of his Appeal). Birkenstock emailed another individual at NCHS to obtain the account numbers to pay NESA and forwarded that information to Martinez. ECF No. [228-13] at 9. Martinez then submitted the invoices for payment. *Id.* In short, Martinez claims that the invoices "went through NCHS's formal channels," and the splitting of the original invoice "was for the benefit of NCHS." *Id.* at 9-10. Martinez additionally complained that NCHS failed to provide a copy of the "almost" $500,000 invoice that Martinez allegedly split. *Id.* at 8 n.1.

The Final Denial, written by Hogan Lovells on behalf of the Administrator, again concludes that Martinez split the invoice for an improper purpose. ECF No. [92-6] at 17. The Final Denial faults Martinez for failing to provide supporting documentation in support of his assertion that Martinez and Birkenstock agreed to defer payment to NESA until there was substantial completion of the project. *Id.* Martinez's Appeal contains his Declaration and a memo from Birkenstock that corroborates Martinez's version of events. ECF No. [228-14] at 74-75, 325-27.

The Final Denial contains additional allegations that Martinez "often demanded payment to NESA" and, in this occasion, "intimidated" a NCHS employee into approving the invoices. ECF

No. [92-6] at 16. The Final Denial contains no exhibits in support of these accusations. It still lacks a copy of the original invoice that Martinez allegedly split, and it summarily rejects the Birkenstock memo without mentioning that it supports Martinez's explanation for the split invoice. *Id.* at 15. Nor does the Final Denial discuss a Declaration that Hogan Lovells apparently drafted on Birkenstock's behalf, which, like the Birkenstock memo, supports Martinez's claim that the invoice was split "to articulate project progress." Birkenstock Dec. ¶ 32, ECF No. [228-23].

This invoice-splitting example reveals that the Administrator has not discharged its duties with the "care, skill, prudence, and diligence" that ERISA requires. 29 U.S.C. § 1104(a)(1)(B). The Administrator has unequivocally and consistently stated that she reviewed no evidence *other* than that which was attached to Hogan Lovells' Adverse Determination Letters. *See* Laurence Dec., ECF No. [176-1] ¶ 17; Laurence Dep. at 13:18-23, ECF No. [230-18]. If that was the only evidence considered, the Administrator could not possibly have reached the conclusions that Martinez "often demanded payment to NESA" and "intimidated" a NCHS employee into approving the invoices, ECF No. [92-6] at 16, unless she relied blindly on Hogan Lovells' conclusions. For the reasons explained in Part B.ii, *supra*, such reliance was inappropriate.

Moreover, the actual record before the Administrator was manifestly lacking. First, the record before the Administrator did not contain the original invoice for slightly less than $500,000. Second, it lacked a key piece of evidence in support of Martinez's claim: the Birkenstock Declaration. That Declaration is dated August 20, 2020, ECF No. [228-23], so it was apparently available to Hogan Lovells before the Final Denial was finalized on August 24, 2020. ECF No. [92-6] at 2. Yet the Declaration was not provided to the Administrator. A reasonably prudent administrator would have found the lack of investigation into Birkenstock concerning, because one of the invoices at issue contains his name and details regarding the account and project number.

ECF No. [92-5] at 93; *see also Boysen*, 767 F. App'x at 811 ("A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support the claim[.]" (quotation marks omitted)). He was therefore the best witness to either corroborate or refute Martinez's version of events. As the memo and Declaration reveal, he largely corroborated Martinez's story. But the Final Denial ignores his statements that are favorable to Martinez. *See Melech*, 739 F.3d at 675 (an administrator is "not free to ignore" evidence favorable to a claimant).

It is telling that, in support of its position that the Administrator correctly determined Martinez to have violated policies in splitting the invoices, Defendants cite extensively to evidence that Hogan Lovells did not present to the Administrator. ECF No. [227] at 16-18. None of that evidence could be considered if the Court were to evaluate the merits of the Administrator's decision, because it was not "available to the administrator at the time it made its decision[.]" *Blankenship*, 644 F.3d at 1354. Defendants' reliance on that evidence further demonstrates that the Administrator's determination was not "based on a complete administrative record that is the product of a fair claim-evaluation process." *Melech*, 739 F.3d at 676.

### (2) The China Trip

A second example of biased decision-making relates to an allegation that Martinez committed an "act of moral turpitude" by paying for a trip to China for a NESA executive, Neil Salem. ECF No. [92-5] at 8. The Initial Denial does not cite to any evidence in support of this accusation. *See generally* ECF No. [92-5]. In Martinez's Appeal, he denied paying or approving payment for the China trip and submitted a Declaration stating that Salem paid for the trip himself. ECF No. [228-13] at 38.

In response to Martinez's Appeal, the Administrator and Hogan Lovells chose not to

interview Martinez or Salem, and they produced no evidence in support of the accusation. Rather, the Final Denial faults Martinez for "not provid[ing] any evidence" that the expenses were paid by NESA rather than NCHS, and concludes that Martinez's funding of the trip supports the decision to deny him benefits. ECF No. [92-6] at 22. Like the Initial Denial, the Final Denial is devoid of any evidence indicating that Martinez paid for the trip. *See generally id.*

Even today, Defendants have produced no evidence that NCHS or Martinez funded NESA's trip to China. In Defendants' Statement of Material Facts, in support of the statement that "NCHS funded a trip by NESA personnel and others to China," Defendants cite to a Declaration from David Bratt, the former Director of IT Services at NCHS. *See* Def. SMF ¶ 46 (citing to Bratt Decl. ¶¶ 118-19, ECF No. [228-16]). However, Bratt's Declaration does not state or imply that NCHS paid for NESA's trip to China. Bratt Decl. ¶¶ 118-19, ECF No. [228-16]. There is no record evidence whatsoever to support this charge against Martinez.

Given the lack of evidence that Martinez or NCHS paid for the China trip, an administrator acting with "care, skill, prudence, and diligence" could not have found this accusation to be substantiated. 29 U.S.C. § 1104(a)(1)(B). Moreover, it was unfair for the Administrator to fault Martinez for failing to provide evidence that NCHS *did not* pay for the China trip, when the Administrator "was in a much better position to identify and review internal information" to uncover evidence that NCHS *did* pay that expense. *Boysen*, 767 F. App'x at 811. "It is antithetical to the plan administrator's fiduciary duty to refuse to seek documents that would be in the exclusive control of the company and then blame [a claimant] for not producing sufficient evidence." *Id.*

### (3) Unsigned SOW and Metadata

A final example demonstrates the one-sidedness of Hogan Lovells' investigation. One of the Initial Denial's accusations against Martinez was that he never executed a signed version of a

Statement of Work ("SOW") related to a NESA project. ECF No. [92-5] at 6. In support of that accusation, the Initial Denial includes two versions of the SOW, one of which is unsigned and unmarked, and the second of which contains Martinez's handwritten notes but is missing the final signature page. ECF No. [92-5] at 95-99.

In Martinez's Appeal, he asserted that a signed version of the SOW should exist on NCHS's database. ECF No. [228-13] at 20. In support of his Appeal, he attached as Exhibit J a third version of the SOW, which is signed by both Martinez and the CEO of NESA on September 29, 2017. ECF No. [228-14] at 81. Martinez requested that NCHS search for this third version on the NCHS database and also review the metadata on NCHS's second version of the SOW, to determine when it was uploaded into the NCHS database. ECF No. [228-13] at 19-20.

Following Martinez's Appeal, an associate at Hogan Lovells requested that NCHS "ask someone in IT" to "check the metadata" on NCHS's second version of the SOW. ECF No. [230-22] at 5. An attorney at NCHS responded, "[t]o check the metadata, I'll need the actual file Ed says is the original." *Id.* at 3. The Hogan Lovells associate relayed NCHS's response to the Hogan Lovells partner:

> He said to check the metadata of the SOW Ed attached as his exhibit J, we would need the actual document itself (as exhibit J has different metadata). I don't think it's worth asking [Martinez's counsel] for this at this time, as we could get into a dispute about metadata at a later time and just argue in our response that the version he attaches is not in NCHS's database . . . .

*Id.* at 2.

The Final Denial states that "[t]he signed version of the SOW that Mr. Martinez provided in Exhibit J was not found in NCHS's system after diligent searches." ECF No. [92-6] at 14. It further states that "the full version of the unsigned SOW actually includes handwritten notes from Mr. Martinez on the front page, which indicates that Mr. Martinez had clear knowledge that this

SOW was unsigned." *Id*. at 13. The Final Denial summarily rejects Martinez's submission of an SOW signed by himself and the CEO of NESA: "Mr. Martinez's convenient ownership of the sole signed copy of the SOW indicates that his signed SOW may be falsified[.]" *Id*. at 12.

Several conclusions are apparent from this process. First, neither NCHS nor Hogan Lovells performed a diligent inquiry to investigate the metadata issue. They appear to have misunderstood Martinez's request, as he was asking them to check the metadata on the second version of the SOW that NCHS found on its database, not the version of the SOW that Martinez produced. ECF No. [228-13] at 19–20. Regardless, Hogan Lovells' decision not to request the original document because it could lead to "a dispute about metadata at a later time" further evinces that Hogan Lovells was defending NCHS's decision "in anticipation of litigation," not conducting a fair investigation of Martinez's claim. ECF No. [230-22] at 2.

"A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support the claim; indeed, an ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Boysen*, 767 F. App'x at 811 (quotation marks omitted). Here, investigating further the metadata issue would have required either (a) downloading the second version of the SOW on NCHS's system, or (b) asking Martinez to produce the original version of the SOW he attached to his Appeal. In neglecting to do either, the Administrator failed to discharge its duties with "care, skill, prudence, and diligence." 29 U.S.C. § 1104(a)(1)(B).

Second, the Final Denial contains a blatant factual error and, consequently, an unfounded accusation against Martinez. Contrary to the statement within the Final Denial, the "full version of the unsigned SOW" is not the version that "includes handwritten notes from Mr. Martinez[.]" *Id*. at 13. Rather, Martinez's handwritten notes appear on the version of the SOW that is missing the

final signature page altogether. ECF No. [92-5] at 95-99. The Final Denial's conclusion that "Martinez had clear knowledge that his SOW was unsigned" is therefore unsupported by the evidence before the Administrator. ECF No. [92-6] at 13. This error is indicative of a reflexive bias against Martinez's claims and a failure to exercise care in resolving them.

In sum, the three examples discussed in this section reveal how the claim review process led to a one-sided investigation, an incomplete administrative record, and a Final Denial that is written in an adversarial manner. Those are by no means the only examples that the Court could have chosen to evince the "procedural unreasonableness" of the Administrator's review. *Melech*, 739 F.3d at 675. As Martinez correctly points out, "the Adverse Determination Letters read more like allegations and unsupported conclusions *against an opposing party* rather than like the decision of an impartial arbiter who has a fiduciary duty to weigh all the facts presented by both sides to render an impartial decision." ECF No. [230] at 10 (alteration in the original); *see also Watts*, 316 F.3d at 1209 (ERISA envisions "a nonadversarial method of claims settlement" (quotation marks omitted)). That result is unsurprising, given that the drafter of the letters openly admits that Martinez was considered an "adverse party." Steinberg Dec. ¶ 13, ECF No. [76-2].

### iv.  Martinez Did Not Receive a Full and Fair Review.

Martinez was not afforded a "full and fair" review of his severance claim. 29 U.S.C. § 1133(2). The process proceeded as follows: (1) the Administrator predetermined the outcome of Martinez's claim; (2) the Administrator hired a law firm to defend its decision; and (3) the Administrator rubber-stamped the law firm's analysis. Predictably, this process did not lead to a "complete administrative record" nor a fair evaluation of Martinez's claim. *Melech*, 739 F.3d at 676.

The Court does not opine that an administrator is prohibited from hiring outside counsel to

review a claim for ERISA benefits. Rather, hiring an independent, impartial adjudicator could be an effective way "to reduce potential bias and to promote accuracy" of a claim adjudication. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). In this case, however, the Administrator hired the law firm "in anticipation of litigation," to defend its decision to terminate Martinez for cause. Laurence Dec. ¶ 16, ECF No. [230-18] at 30. "Simply accepting the bald assertions of [that law firm] without examining or evaluating their underlying bases and failing to obtain additional relevant information was arbitrary and capricious." *Shannon*, 113 F.3d at 210.

Due to the "procedural unfairness" employed by the Administrator in this case, the appropriate remedy is to remand this matter to the Administrator to conduct the "full and fair review" that ERISA requires. *Melech*, 739 F.3d at 676; *see also Browning*, 2019 WL 7841719 at *6 ("If a court finds that the administrative record was incomplete, the appropriate remedy is to remand the case to the claims administrator for further review.").

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, **ECF No. [227]**, is **DENIED**.

2. Plaintiff's Motion for Summary Judgment, **ECF No. [230]**, is **GRANTED IN PART AND DENIED IN PART**.

3. This case is **REMANDED** to Defendant Nicklaus Children's Health System Executive Severance Policy, for reconsideration of Martinez's claim for severance benefits.

4. To the extent not otherwise disposed of, all pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**.

5. The Clerk of Court is directed to **CLOSE** this case.

Case No. 21-cv-22700-BLOOM/Otazo-Reyes

6.   The Court retains jurisdiction to resolve any post-judgment motions.

**DONE AND ORDERED** in Chambers at Miami, Florida, on May 25, 2023.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record